Good morning, Justices. My name is Shimon Cahan and I represent the Penalty Appointment. You may have to speak up a little tiny bit. Yes. And that 15 minutes includes rebuttal time? It does. You can set aside some time. You know, we rarely keep you to those 15 minutes, but in this case we might have to because of the number of cases to be heard. But if we have questions, we'll definitely allow you to answer those questions. Sure. I'd like to reserve two minutes for rebuttal. Okay. This is, in short, a trucking case wherein an unloader was struck by a truck that was backing up that had loud beeping alarms going off. And it was a close call for the jury in terms of awarding a large sum and reducing by comparative fault. A number of issues I want to address briefly with respect to the reason we believe that we are entitled to a new trial on liability and damages with regard to the evidence that the jury was allowed to hear. The first thing, although the plaintiff, in argument and response, states that there was no negligent entrustment case presented to the jury, long before there's Well, why don't we get to the crux of that. Was there an instruction on that theory? Well, it was, Your Honor. It's yes or no, huh? I believe it was. It was in court. And what instruction would that be? The instruction was, under the issues instruction, failure to have the appropriate skill, experience, and quality. Is that the negligent entrustment, or does that go to the negligence of the driver himself? Under Gant, the only reason that would be relevant is if it's going to the derivative liability of the truck company. And, in fact, in this case, when the plaintiff Well, let's address that. What's the basis for the liability of Carmichael? Well, the liability of Carmichael Is it negligent entrustment, or is it by virtue of the placard on the truck? Well, and that's important for two reasons. One is that agency had been determined as a matter of law at trial, and in spite of that, they were allowed to plead and file an amended complaint alleging negligent entrustment. And when they did so, if you look at the argument by the plaintiff in doing so, it basically states that this is based on the inappropriate licensure and the testimony of Atkinson. So in spite of agency being determined, where none of this should have been an issue, they were allowed to plead. But you understand that even if there's a pleading on the theory, if that theory doesn't go to the jury, then where's the harm? Well, even though it wasn't called negligent entrustment, all the testimony regarding qualification experience, all relevant only to the negligent entrustment count, came in through their opening, their testimony. What's the standard of review on that, allowing a late amendment to the complaint? Well, that would be in the discretion of the court. But in terms of the overall prejudice in allowing the evidence of negligent entrustment. So let's get this right. You say there's an agency issue before the jury. Well, the agency matter has been resolved by virtue of a ruling pre-trial, but it is before the jury in the sense that it's there, right? No, Your Honor. I disagree. Under Gantt, it's been determined as a matter of law. The court took that away. And the plaintiff in fact. They took it away in terms of a finding by the jury, but it's still there in terms of adding context to the complaint itself or adding context to the case. But that is exactly why under Gantt it's stated that if agency has been determined as a matter of law, it is not relevant and the purpose can be very prejudicial, which in this case it was. It was the centerpiece of their closing argument. In addition to the one instruction, the jury could have found simply because he didn't have the appropriate license, based upon that one thing, and they said this in their close, that that was sufficient for a finding of negligence. And that's not what Gantt says. In fact, under the other cases in terms of licensure. Just so it's clear, the instructions did have allegations of negligence attributable to, what is it, Mr. Lindsey? Lindsey. They did. That they had, that the jury had to accept before finding liability to Mr. Lindsey. Well, one of the four. They had to. They didn't have. They could have not found and not believed that it was negligent in the way he backed up and only found. And this is the centerpiece of their closing argument, that because you didn't have the appropriate qualification, therefore, he was negligent and this caused the accident. Reading the instructions, you can find that. This is then compounded, by the way, with that, the introduction of all that evidence on preventability. Preventability, in short, means if you could have swerved left to avoid an accident, then it's preventable. But that's not what the standard is, and that's why the federal court that addressed this in Illinois, and the only court that addressed it, said it's not admissible because prevent, you actually have to determine two things. One, could you have swerved left to avoid the accident? And two, if you didn't swerve left, were you negligent in doing so? It's very different. But the jury heard all of this come in. They heard evidence over objection in terms of standards within the industry. The only time this is relevant, and the plaintiff cited a case, the industry regulations and internal regulations are relevant to the Adams case because it's medical malpractice and the official comment to the IPI instruction for Med-Mal says it's relevant. It's not relevant in an auto case. The only thing this jury should have heard is when he was backing up, was he negligent or not, and was the decedent negligent because he didn't hear the three opinion matters. And wouldn't you say that both of those matters were addressed by the jury in one sense, the verdict itself, 3 million, and then the decedent's liability or culpability by virtue of cutting the award in half? No. Unfairly, the jury could have determined solely, and again, they were led this parade of evidence, and combined with the instruction, there was a federal statute that was incorporated into the instructions. They could have determined this solely on the basis of licensure, which is inappropriate. I would like to briefly address the drug issue because it's simply something I believe is plain error. Well, that raises an interesting point because plain error, I looked for it in your main brief and I didn't find it.  Can you raise it in your reply? I believe the court can, nothing is waived as to the court in terms of responding to it. We did raise it in our post-trial, but only if the court deems it not waived to the court. So at this point it's waived, so let's not spend too much time on that, okay? Okay. The simple issue is that the decedent, under the wrongful death instruction, habits of industry and sobriety are relevant. Why don't you address the argument that your expert didn't really address the day events being impacted by his drug use? This was very subtle and technical, but what the expert said is, I'm not the jury. I can't say that this was the reason that the accident took place. What he said, and with all cases involving intoxication or impairment from drugs, he stated that no doubt when you are under the impairment of heroin, or in this case he said morphine, your sense or your perception, everything is affected. It's not like the diabetic condition that was raised in one of the cases. But let's take an example of an individual under the influence of drugs standing on the corner and being struck by someone negligently driving the vehicle. The fact that he's under the influence of drugs standing on the corner didn't make the accident any more likely to happen. And in this case, you have the guy's back towards the truck, and nobody thought that he was going to continue rolling backward and, in fact, striking the truck. And Mr. Williams goes so far as to jump out of the way to avoid being hit by the truck, all of which says that the drugs really didn't have anything to do with it. Now, you know, I have to say that if the drugs went to perhaps his ability to earn a living in the long term or his life expectancy, I mean, that could be one thing, but that's not why it was offered. And wasn't it, in the final analysis, a reasonable accommodation for Judge Flannery to have barred reference, in the first instance, to heroin, but to have allowed reference to its metabolite? So solely with regard to the impairment issue, very well may have been, because calling heroin or morphine may not have mattered. But, again, they introduced evidence affirmatively that he was not using drugs. He had not used drugs. They opened the door on that, and under this instruction itself, it was relevant. Justice Garcia, you had mentioned before, let's get to the issue with regard to the derivative liability. And our argument with regard to the work comp defense is twofold. The first is that under Wilform and Walker, Walker, which was a case that was decided after Shugler and Pryder in the cases with placard liability, it was decided, and it references placard liability. In that case, they say that... Before you do that, let me interrupt you, and I apologize for throwing you off track a little bit. But I do want to sort out the relationships between Lindsay and the decedent, as well as Carmichael. Sure. Lindsay goes to Carmichael. There's nothing that says that the decedent goes to Carmichael, but you're trying to connect all three, even though there's a connection between Lindsay and Carmichael, and maybe between the decedent and Lindsay, but there's no line that goes from the decedent to Carmichael. Okay. Let me address that. The first two things, and again, the first reason why we're still entitled to judgment based upon the work comp is because, as we stated in our original statement of facts, the stipulation was that the defendant driver, Lindsay, and the decedent were fellow employees of Open Kitchens. That was stipulated, and that's what all we stated in the fact section. As such, under Wilform and Walker, Lindsay was entitled to judgment as a matter of law, and he's immune. If that's true, under Wilform and Walker, another company can't be vicariously liable for a immune part. Now, let's say there is this concept in work comp. Let's say he was a, what's the term, borrowed employee or loaned employee? Let's say he was a loaned employee to Carmichael, and to the extent that he was a loaned employee to Carmichael, there is no relationship between Lindsay and decedent in the course of being, in the course of doing his duty for Carmichael. The cases that we cite, and the statute itself says, the work comp statute says, and the cases say that a borrowing or a lending employer, even if you're not, if you weren't the employer at the time for other reasons, the borrowing or lending employer, as well as the special employer, can assert the work comp defense. All can assert that. Even if he was considered an employee of Open Kitchens. All of them could assert it. Open Kitchens could assert it, as well as both of them could. I believe under the law, they can both assert it, and the owner. I'm sorry, Open Kitchen and? Open Kitchens and Carmichael. Even though Carmichael has no relation to the decedent. Because for two reasons. One, that Carmichael can only be vicariously liable for conduct of a party that can be held negligent. Lindsay can't be held liable. He is immune from liability. Second, and now we get into those placard line of cases, and I want to address some of the three cases that the plaintiff raised in their reply brief. Which is, there were two Ohio cases, or two Pennsylvania cases, one Ohio. But the dichotomy that all these cases have created is, were you a member of the public, or were you not a member of the public? Even in the three cases that the plaintiff cited, those were actually helpers. And what the court stated in all three of them, which was that the helper, while they were on a truck at the time of the accident, at all times, one court, Smith said this helper was a member of the public because they were actually traveling to their place of employment. They weren't doing their job as a helper or a loader. In the other case, they said they had finished their job. And the third one, again, in the Stone Rock case, they said, no, they weren't doing their job as a helper. In this case, the decedent was doing his job as a helper. But let me tie in to get back to another question you mentioned about how they're all related. Everybody in the test, this is in part from offers of proof as well as the record, everybody was taking their direction. That is, Lindsay, the decedent, Williams, they were all taking their directions at the beginning of the morning from the open kitchen supervisor. They're doing this lunch program for the Chicago Housing Authority, and every morning there's a truck driver who's assigned a number of helpers. Lindsay himself said, with me I had three helpers, but when I got there I was expecting two more to help. I believe it was either Melvin Simpson or the other person who was on the decedent's truck who actually thought that the decedent was with Lindsay on the date of the accident, but that was incorrect, that on prior days, if this had been a different day, then Lindsay and the decedent had worked together on the same vehicle. They had been part of the same crew. They're all part of the same enterprise. And under RIDDLE, which is the federal court case that first mentions members of the public dichotomy, RIDDLE says you look to determine whether or not the person is a member of the public, and there you look at the overall economic enterprise. The statute, the very sword that makes a driver a statutory employee under 49, the regulation, says that helpers are also statutory employees. And to that extent, he was doing his job as a helper. He wasn't on a break. He wasn't doing something else. Let me ask you regarding that. When they say member of the public, is a member of the public anyone other than an employee of the trucking company so that an employee can be a member of the public so long as he's not employed by Carmichael? Well, but this is why, based on the job that they were doing, I think it's, and this, we didn't, this was raised, again, in terms of misrepresenting something. It was stipulated only on the open kitchens. Our argument in our brief is that he was also clearly a statutory employee, the decedent was, by virtue of the fact that helpers are listed as statutory employees. And when he got there, they're all doing, they're all part of the same overall job. I'm hearing that if the person has a job title of helper, it doesn't matter who may be operating the truck, that person is a statutory employee of every truck driver or of every truck that comes into the docking system or docking place of kitchens. I don't mean to say that except that it's part of this same program. They're all working together. There isn't any dispute, even with the offer approved from Williams, that on any given day, every truck driver or any helper, they're all getting assignments from the same people and working together. So, yes, to that extent, this isn't the same situation as if you were at a different dock and there was somebody who was just loading and unloading the truck. I think I'm going to wrap it up. You can wrap it up and then we'll give you two minutes. Okay. You can wrap it up right now if you want to, if you have a closing remark. Okay. Based on the combination of the testimony as far as the, I guess if I can, I wanted to throw one more thing in there about the Parentage Act, which is that the Parentage Act was not complied with. If there had been compliance as set forth in that statute very clearly, which is either that they married during the course of their lifetime or there was a written acknowledgment by the decedent during his lifetime, then there would be a presumption. Let me ask you on that. I mean, are you talking about the Parentage Act issue being a question of law or a question of fact? If it's a question of fact, if it's a question of law, it should have been resolved prior to the jury. And if it's a question of fact, we let the jury resolve it. But it isn't, it's a different standard. It's a clear and convincing evidence. Let's say it's a very, well, let's say it's a very different standard. The question is, did the jury resolve it? Was it within their province to resolve it? They did not know what the standard was. They didn't know that there's three different ways that this could have been determined. One of a written acknowledgment, also on the birth certificates, or intermarriage. They didn't know about any of that. It was, in fact, the instructions simply state that you are eligible. Did they offer an instruction to clear up that point on your client's behalf? We did not have the burden to show, because there was no presumption, we didn't have a burden to challenge that. The plaintiff had the burden to demonstrate parentage. And if they were only the heirs and not the biological children because of marriage, then there would have been a different loss-of-society instruction. The loss-of-society instruction, you don't get loss-of-society presumed if they are not the children. They would simply be the legal heirs, which is all that their prior order said. And if they're the legal heirs, the only recovery they would have would have been for the survival action. There was no money awarded for survival. There would be no recovery here. So I believe that's true. I'm sorry to interrupt. Why wasn't the probate order sufficient in your estimation to establish that? Because all the probate order states is that the court found that the heirs were people listed. But there is nothing stated there. And there's no indication in the record that's been presented that the Paternity Act, which is very specific in terms of what needs to be complied with. And think of it. The plaintiff is doing something here. They're getting an easier determination during the death of the decedent than it would have been during the life in terms of DNA, whether or not you signed a written acknowledgement or not. They're skipping a step that is a highly contested issue in any act that's in any issue where the Paternity Act comes up. Let me ask you one final question regarding paternity. You do concede that your argument is that there's insufficient evidence, but you concede that sufficient evidence may exist, it just wasn't presented? We don't. We contend, Your Honor, that they had a burden to demonstrate paternity as part of their overall burden of proof. And they did not do that. Let's say we bought into that. Would an evidentiary hearing remand to the trial court to resolve that issue based on the evidence be sufficient? Because you present it as more or less a question of law, a prime official case. I believe it was something that they didn't determine as part of their case in chief, and therefore because they failed to meet that burden. But that would be the alternative, that it could be remanded certainly. You've given me additional time, so thank you. Yes. Good morning. Dan Meenan for the plaintiff. We frankly felt that you wanted us here this morning to talk primarily about this placard liability issue. The other issues seem to be fairly straightforward. Counsel, you're free to address any issue that you have. I didn't mean to suggest that I was going to limit anything. That seems to be the one that has some primary focus and actually had some primary focus of the questions. And I think, Justice Garcia, your reference to kind of a bright line is the key to that whole issue. There's no question that these various players in this case were co-employees at the first two levels that were involved. Excuse me. They were provided by the temporary agency to open kitchens, and on that level they were, in fact, co-employees, which is what was stipulated to them during the course of the trial. The only statutory employee in this case was Harold Lindsay. How do you define statutory employee? When someone gets behind the wheel of a truck, which is identified with the name of the carrier, with the ICC logo, as a matter of law, those placard liability cases take effect and that employee becomes a statutory employee. How about the three helpers that were in the truck? The helpers are not employees under the cases that we cite in our brief. Even though they're in the truck with Lindsay? Well, that could be a different question. That's what I'm asking you. I'm asking you about Lindsay's helpers. Were they statutory employees? No, not in our view. First of all, we do not concede, and the evidence didn't reflect that Taylor was a helper at all. There was not evidence that Taylor was working on this truck when the incident occurred. He was working on the dock. He was behind the truck. Oh, Taylor's the decedent, right. Well, there is no evidence that he was part of the three helpers of Lindsay. No, but the cases that we cite suggest that... What about the woman in the truck with Lindsay? I believe she may have been asleep when... There could have been some argument that she was a helper and that she may have been a statutory employee. But, frankly, the cases that we cite, and they're not Illinois cases, and that's why it's of some interest, I'm sure, to the court, are directly on point. The Matkins case, the Wilkerson case, and the Stonerock case... Well, you heard the distinction that counsel offered, and counsel offered the distinction that those helpers were not acting in the course of their employment, and obviously Mr. Taylor was here. Well, he was acting in the course of his employment, but he wasn't working on the truck that killed him. That is a distinction in and of itself, I believe. And I also believe those cases clearly indicate that even if he were working on that truck, as long as he doesn't have an interest in the carrier, that's the case, the Rytle case and some of the cases that the defendant cites, the distinction is that the helper also has some interest either via lease or ownership in the placard owner or the owner of the truck. That simply isn't the situation that was dealt with here. So we believe that on three separate levels, both Judge Larson and Judge Flannery's decisions in that regard are correct. First of all, being the only statutory employee, Lindsay was probably determined to be vicariously responsible if... I'm sorry, Carmichael was vicariously responsible if Lindsay was proved to be negligent, number one. Let me ask you, to interrupt you, but regarding the worker comp, there was some argument regarding preemption, and the question is, do we have to reach that? I don't know that you do, but I think the Supreme Court already has. It's implicit, if not explicit, in Crider and Scheinman. They don't deal head-on with preemption, but the decisions and the rationale talk about the preemptive nature of the federal regulations in the area of interstate commerce. So I think the Supreme Court has already done that. But that was addressed. They suggest that it was somehow passed over. To the contrary, we talked about it in a brief. It was part of the summary judgment proceedings before Judge Larson. It is actually, I think it's 1397 in the record. There was a pretrial submission on that issue. So I don't see how there could be any suggestion. First of all, preemption wasn't raised, discussed, and argued. And second, that it doesn't apply to this situation. This is recognized in the Illinois Supreme Court cases as being an area that has been preempted. And if, indeed, there is a legitimate conflict between the workers' compensation statute and the federal law in this area, under that doctrine, the comp act is trumped. Counsel talked about this issue of paternity. And I think, again, the questions that I think you posed, Justice Garcia, are dispositive. This was a fact issue. This was not a matter that was presented as a matter of law to be determined before the trial or even dealt with on that basis in post-trial proceedings. There was ample evidence, and I'm not going to go through it all again. The briefs address it. Asked to the paternity of Mr. Taylor to these kids. Sandra Logan testified, the mother, people from the schools. There was testimony about written submissions to the schools. There was testimony about written submissions to public aid. The probate order of airship was submitted. The defense presented virtually no evidence on the issue. They tried to prove a negative by suggesting that the birth certificates that did not show Mr. Taylor as the father were dispositive or somehow weighed in on that. But they virtually presented no evidence. The jury determined that issue and appropriately so. Counsel talked a little bit about this question of negligent entrustment, which is essentially a fiction that's been presented here on appeal. There was no such issue raised in the trial court. This case went to trial in a Sixth Amendment complaint, which was a two-count complaint, wrongful death and survival. There was never any instruction proposed. Those matters that dealt with the license, for instance, went to credibility, training, skill, knowledge, and things of that nature. I believe it was the defendant's instructions that were actually given with respect to the applicable standard of care. None of this was ever argued in that context. That was simply not a theory that was presented. As to the question of preventability, I'm not going to argue again the waiver arguments. I'll leave that to the court. But we feel it's been waived, number one. Number two, it was presented not as a theory of liability again, but as a concept supported by expert testimony from Mr. Atkinson about measures that could have been taken that would have avoided this accident. It was never given in connection with an instruction. The word was never used in any instruction. And again, it was never presented as any sort of a standard of care in and of itself. On the drug issue, the heroin issue, I frankly have a hard time understanding. Dr. O'Donnell testified at great length with respect to his opinions with regard to perceptions that he had about Mr. Taylor's use of morphine. He was permitted to do that even though he could not in any way causally tie it to the accident. There was a great deal of testimony presented by the plaintiff as to Mr. Taylor's functioning throughout the course of that day appropriately and without any problems. There was a lot of contradictory evidence on the topic. I guess what they're arguing is that they were somehow prejudiced by not being able to use the word heroin instead of morphine. I frankly don't know what the impact of that would have been or how that's errored. They had also raised the issue that I think you had three witnesses who were able to testify that the sedent did not use. And that's probably the main reason that the evidence went in at all, and it went in at length about Dr. O'Donnell's opinions with respect to his use of morphine. Just to be clear, when did that layman's evidence come in, testimony come in? Did it come in post-expert or pre? I don't know, Your Honor. I'm not sure. I can't answer that. But in any event, Judge Flannery properly determined that stepping across the line from the morphine to heroin was certainly more prejudicial and probative. We feel and believe that all of the matters below were properly handled by Judge Larson, by Judge Flannery, properly decided by the jury, and we respectfully ask that you affirm the verdict in all respects. Thank you, Counsel. Counsel. Justice, just briefly to address everything that was raised. First of all, of course, the testimony on that heroin was introduced or the lack of drug use was introduced through witnesses Josephine McCord and Bridget Miller during direct examination of Plaintiff's case in chief. So they opened the door on that. Second of all, with regard to the birth certificates, Plaintiff just stated that the fact that those birth certificates didn't have the decedent's name on them was irrelevant. We were somehow trying to show something that wasn't true. That is one of the ways the Parents Act shows compliance. And one of the other things that we weren't able to introduce because they weren't given to us, this tax return issue, we requested the tax returns years before the trial. At the time of trial, right before the trial started, Plaintiff's counsel said, well, we don't have those. They don't exist. And then Sandra Logan gets on the stand, and no, she is not the administrator, but she's the mother of all the kids that they represent. And she says, well, no one told me I had to bring it. She's over at their office. She says, I have them. That very well may have had evidence as well regarding this issue. Finally, with regard to the preemption issue, the case is cited by the Plaintiff. The Empire case, Empire Marine is a non-illinois case, but they cite it. It's a Maryland case. And they cite it because of the placard liability. But what it says in that case is that the federal regulations don't preempt state law. And the reason is consistent with the other two cases they cite from Illinois, which are, one, in a CARMAT case, yes, it is the only cause of action. It provides a cause of action. You can't file a negligence claim, which this is what they filed under state law. You can't proceed on negligence, breach of warranty, and also CARMAT. You get one. And then the other cases were admiralty cases, which have original jurisdiction, and it's the only cause of action. It's original jurisdiction in federal court, and no state law will interfere with or serve as a defense. Let me ask you regarding that. When you say that placard law doesn't preempt state law, does state law preempt the placard law? I mean, would there be any point to the placard law in this case if we rule that worker comp barred the claim by Mr. Taylor against Mr. Linz? Yes, because under the Walker case. And if we interpret the federal law to be enacted to protect the public and non-statutory employees, how would we give effect to that if we say that in this case it doesn't have any role to play? Well, because the placard liability isn't simply a strict liability if there's an accident. And that's, in effect, what the plaintiffs argue. No, they still have to prove Linz's negligence, didn't they? They did. They did. I don't mean a strict liability on the agency. It's vicarious. Right. But the placard cases and Walker, again, which reiterates Crider and Shetley, says this was created for the statutory mechanism in terms of the member of the public because of the idea of leases being transferred from one party to another. But it wasn't meant to protect, and they say in that case, people who are working within the scope of their employment. And that's why we get back again to this issue of statutory employees. It also is consistent, the Walker case, again, after all these cases came out. So it's really just meant to address some sort of shell game of keeping the responsible party hidden? It's placing a financial responsibility so that there's somebody to the members of the public. But here again. You don't have to wrap it up. You can wrap it up. Okay. Just the last thing being that even the Walker case, they say, look, we know that there is placard liability, but the affirmative defense there was stricken, and it shouldn't have been. An affirmative defense is a valid defense, even if there is potential placard liability. It's a question of was the person working within the scope of their employment? What were the circumstances at the time? It's not an absolute, well, if there's a placard. Any jury instructions regarding that? We were not allowed to present evidence on the, it was shut up. That's evidence. Well. What about the instruction? We did not present an instruction, but long before when the determination had been made, I think an opening statement that there was an agreement or a stipulation that the two were fellow employees of Open Kitchens. There was no more further questioning allowed with respect to Lindsay and who else he worked for in terms of Open Kitchens. We weren't allowed to get into that. All right. But we did not tender a specific instruction on that. The answer to your question. All right. Well, thank you very much. Thank you for listening. Thank both counsels. And once again, thank you for arriving early. And the case will be taken.